(No. 5622. June 25, 1931.)

STATE, Respondent, v. JOHN C. McCLURG, Appellant.

[300 Pac. 898.]

D. W. Zent, for Appellant.

768

Fred J. Babcock, Attorney General, Z. Reed Millar, Assistant Attorney General, and J. P. Reed, Prosecuting Attorney, for Respondent.

VARIAN, J.—John C. McClurg appeals from a judgment and conviction of murder in the first degree, punishment being fixed by the jury at death, and from an order denying his motion for a new trial. Omitting the caption, names of parties, prosecuting attorney and witnesses, the information reads as follows:

"H. M. Haag, Prosecuting Attorney in and for Gem County, State of Idaho, who, in the name and by the authority of said State, prosecutes in its behalf, in proper person comes into said District Court in the County of Gem, on the 3d day of March, 1930, and gives the Court to understand and be informed that John C. McClurg is by thir information charged with the crime of murder, and having been duly brought before a magistrate, had his

preliminary examination upon said charge and was by the magistrate thereupon held to answer to the District Court of the Seventh Judicial District of the State of Idaho, in and for Gem County, to said charge, which said crime was committed as follows, to-wit:

"That the said John C. McClurg on or about the 9th day of December, 1929, in the County of Gem, State of Idaho, then and there being, did then and there wilfully, unlawfully, feloniously and with malice aforethought, kill and murder one Mary McClurg, a human being.

"All of which is contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the State of Idaho."

Appellant demurred to the information for that, it does not state facts sufficient to constitute a public offense and does not substantially conform to the requirements of C. S., secs. 8825, 8826 and 8827, which provide, in effect, that the information shall contain the title of the action, names of the parties and court, a statement of the offense in ordinary and concise language, in such manner as to enable a person of ordinary intelligence to know what is intended; that it must be direct and certain as to the party charged, the offense charged and the particulars of the offense charged when they are necessary to constitute a complete offense. The court overruled the demurrer, which is assigned as error.

The information is sufficient, since it charges the crime of murder substantially in the language of the statute. (*State v. Lundhigh*, 30 Ida. 365, 164 Pac. 690; *State v. Askew*, 32 Ida. 456, 184 Pac. 473; *State v. Arnold*, 39 Ida. 589, 229 Pac. 748; *State v. Caviness*, 40 Ida. 500, 235 Pac. 890; *State v. Boykin*, 40 Ida. 536, 234 Pac. 157.)

It is contended that the information fails to state that the magistrate before whom the preliminary examination of defendant was had, was duly elected and qualified, or resided in Gem county, or the state of Idaho, does not give the name of the committing magistrate, or show that he had jurisdiction to hold a preliminary examination.

As said by this court in *State v. Farris*, 5 Ida. 666, 51 Pac. 772, "There is nothing in either the constitution or statutes which, directly or by implication, requires that the fact of there having been a preliminary examination should be set forth in the information." And this is the general rule under jurisdictions having similar constitutional provisions and statutes to those governing here (Const., art. 1, sec. 8; C. S., sec. 8816. See 31 C. J. 643; *State v. Rogers*, 31 N. M. 485, 247 Pac. 828; *People v. Shubrick*, 57 Cal. 565; *State v. Vigil*, 33 N. M. 365, 266 Pac. 920; *State v. Lewis*, 31 Wash. 515, 72 Pac. 121; *Williams v. State*, 6 Okl. Cr. 373, 118 Pac. 1006; *Quen Guey v. State*, 20 Ariz. 363, 181 Pac. 175; *State v. Finley*, 6 Kan. 366).

The trial was held in the annex of the Methodist Episcopal Church at Emmett, instead of in the Rebekah's Hall, theretofore designated by a board of county commissioners as the place for holding the district court in Gem county, there being no public courthouse at said county seat. The trial commenced April 7, 1930, at the annex, the record showing the defendant and his counsel present. Under direction of the trial judge the following order was entered in the minutes, "It was ordered by the Court that because of the unfit and unsafe condition of the present Court Room the place of trial of this cause be changed to the Methodist Church Annex." Appellant asked leave to, and did, file written objections to the change of the place of trial upon the grounds that; the county commissioners have provided a place known as the courtroom of Gem county; that said place has been used for that purpose; that no other place has been provided by the county commissioners; that "no war, insurrection, pestilence, or any other public calamity exists, nor is there danger of such"; that the building for the regular place of holding court has not been destroyed nor is there danger "of the building for holding court"; that the change is for the sole purpose of holding said trial; that the court is without jurisdiction and that it is prejudicial to defendant to change the place of trial. These objections were argued at length and were

overruled, which is assigned as error. C. S., sec. 3463, as amended by Sess. Laws 1925, chap. 85, p. 119, requires the county commissioners to furnish, by constructing a courthouse, or lease of premises and rooms, a courtroom; C. S., sec. 6485, authorizes a judge "by order filed with the clerk and published as he may prescribe" to direct that court be held at any other place in the county than that appointed . . . . when the "destruction or danger of the building appointed for holding the court may render it necessary" and C. S., sec. 6487 reads:

"Sec. 6487. Accommodations for district courts. If suitable rooms for holding district courts and the chambers of the judges of such courts be not provided in any county by the commissioners thereof, together with attendants, furniture, fuel, lights and stationery sufficient for the transaction of business, the court may direct the sheriff of such county to provide such rooms, attendants, furniture, fuel, lights and stationery, and the expenses thereof are a charge against such county."

These sections of the statute authorize the district judge to change the place of holding court to another building in the same town, or another place in the county (C. S., sec. 6485). It is conceded the order entered was not "published" other than it was spread upon the court's minutes.

The entry and publication of the order is to give reasonable notice of the change of place of trial to all parties having business with the court and not to the public generally. Sittings of the court are required to be public (C. S., sec. 6475) and the mere fact that the trial was held in a church annex does not show any prejudice to the rights of appellant. Since the record fails to show any injury to have resulted to defendant by the change he cannot complain. (See *State v. Moore*, 69 N. H. 102, 40 Atl. 702; 15 C. J. 896.)

On April 4, 1930, just prior to the commencement of the trial, appellant filed a motion for a change of venue upon the ground that a fair and impartial trial could not be had in Gem county, "for the reason that public sentiment and

prejudice is too strong against the defendant in said County," basing his motion upon affidavits of himself, J. W. Johnson and D. W. Zent, his attorney. Appellant's affidavit alleges he cannot have a fair and impartial trial in Gem county, for the reason that public sentiment and prejudice are so strong against him that it would be impossible to secure a fair and impartial jury in said county; that said prejudice has been created by improper and erroneous items appearing in newspapers of general circulation in said county, improper and erroneous statements of officials of said county, the excitement caused at the time of appellant's arrest, by improper and erroneous statements given out by interested parties, by a general discussion of the case throughout the county, and "by improper testimony allowed at the preliminary hearing of the Defendant in this case." Mr. Johnson's affidavit is to the effect: that he is a resident of, and familiar with public sentiment in, Gem county; that he believes sentiment and prejudice is so strong that defendant cannot have a fair trial therein; that he has discussed the case with a large number of people and has heard the same discussed by a large number of residents of said county, all of whom, without exception, "has expressed a very decided opinion"; "that for several days last past" he has been endeavoring to obtain affidavits of bias and prejudice in support of the motion for change of venue, "but has been unable to obtain any such affidavits for the reason that he has not found anyone who was not biased or prejudiced," although he interviewed a large number of residents of said county; "that while people generally believe Defendant guilty," they believe it would be possible with proper evidence to convince them of his innocence, "and that therefore he should be tried in Gem County"; that one of the reasons assigned for not giving such affidavit "was that the expense of the transfer was so great to the taxpayer"; another reason assigned was that they wanted to hear the trial and did not want to go to the expense of having to drive to some other county in order to hear it; that a few residents promised to sign

an affidavit of bias and prejudice but before it could be prepared, they informed him that others had discussed the matter with them in the meantime and they could not sign such affidavit; that others refused to sign because sentiment and prejudice were so strong that they feared it would interfere with their business; and that affiant believes for the reasons set forth that defendant cannot have a fair and impartial trial in Gem county. D. W. Zent's affidavit, in addition to the allegations of the Johnson affidavit, states; that other residents informed affiant they would not sign an affidavit upon the grounds that "the bias and prejudice in said county was so great that it would put them in bad in the county"; that a business man, whose name is unknown to affiant, said he would not sign an affidavit for the reason that he believed "Defendant should be tried here in any event, thought he realized that the bias and prejudice in the said County was extremely strong against Defendant"; that affiant interviewed more than one thousand residents of Gem County "and nearly all of them had been to the scene of the wreck set forth at the preliminary hearing in this case, and that, without exception, every one of them had expressed a very decided opinion"; that "bias and prejudice has been caused largely by erroneous and garbled reports of said wreck" in newspapers of general circulation in the county; by testimony at the preliminary hearing of defendant which was improperly admitted in evidence; by erroneous and misleading statements made by interested parties; that affiant does not know the names of the persons talked with, as he is a stranger in Gem county. No specific instances of prejudicial publications, statements, or testimony, are set forth in either of the affidavits.

Respondent filed six counter-affidavits in opposition to the motion, setting forth that the affiants were residents of Gem county and had been for periods ranging from seven to twenty-five years; that each was familiar with public sentiment; that from conversations had with many persons in Gem county, was convinced a fair and impartial trial of defendant could be had in Gem county; that affiant

does not believe there is any unfairness, or bias and existing prejudice against appellant in Gem county other than would, or does exist in any other county in the state; that daily papers published and circulated giving facts of the proceedings had were also circulated in the other counties, and that by such circulation no feeling of unfairness or prejudice toward appellant has been created; that defendant can have a fair and impartial trial in Gem county.

On the *voir dire* examination of the jury the state excused fifty-two jurors for cause and the defendant three, each side waiving the last peremptory challenge. The *voir dire* examination of the jury is not before us but from the minutes of the court it is apparent that appellant did not exhaust his peremptory challenges.

█ █ As has often been held by this court, the granting of a motion for a change of venue on motion of the defendant in a criminal action is largely a matter resting in the sound discretion of the trial judge, and his denial of the motion will not authorize a reversal of a judgment of conviction where it manifestly appears from the record that defendant had a fair and impartial trial and no trouble was experienced in obtaining an impartial jury. (*State v. McLennan,* 40 Ida. 286, 231 Pac. 718; *State v. Breyer,* 40 Ida. 324, 232 Pac. 560; *State v. Hoagland,* 39 Ida. 405, 228 Pac. 314.)

█ In the case at bar, the trial judge was acting within his sound legal discretion in denying the motion.

█ Appellant assigns as error the refusal of the trial court to grant a continuance. The information was filed in this case on March 3, 1930, charging appellant with the crime of murder committed on December 9, 1929. He was arraigned on March 3, 1930, and George C. Heubener appointed by the court to represent appellant. It appears that defendant was taken into custody on December 11, 1929; that he was represented by counsel at the coroner's inquest and preliminary examination and on March 28, 1930, that he discharged counsel appointed for him by the court and employed D. W. Zent, Esq., to represent him.

He notified his counsel appointed by the court, under date of April 5th of such discharge and the employment of Mr. Zent. The cause was set on March 3, 1930, to be tried, commencing with April 7, 1930. On that date counsel moved for court "to continue and postpone" the case for reasons in his own and appellant's affidavits annexed thereto. Appellant's amended affidavit, filed the next day, is to the effect that he cannot safely go to trial on account of the absence of material witnesses. That a certain person whom he believes to be Floyd Taylor, whose true name, or his address, to him is unknown but can be ascertained through persons in Seattle, Washington, would testify that he was an eye-witness at the time and place of the death of Mary McClurg and knows all the circumstances surrounding her death "and that the death of said Mary McClurg was purely and wholly caused by accident and not by any wilful or malicious acts of the defendant." That he did not cause a subpoena to issue for Taylor because his address was unknown. No mention is made of the time when he obtained knowledge of Taylor's testimony. He further stated that on the 28th of October, 1928, appellant met with a serious accident in the state of California, was seriously injured and "for a long period of time" was confined in the Southern Pacific Hospital at San Francisco; that as a result of said injuries appellant was in such physical and mental condition as to cause him at various times "to lose his memory for short periods of time, or in other words to cause his mind to become a blank"; that he was attended by one Dr. Coffee, who would testify to said facts; that he cannot safely go to trial without Dr. Coffee's testimony, which is material to the defense; that it is necessary to take his deposition, etc.; that affiant has used due diligence in procuring said testimony by immediately informing all counsel representing him of said accident and his physical condition; that the hospital records of said accident and injuries are necessary evidence and that he cannot safely go to trial without

them; that if the case be continued until the next regular term the presence of said Floyd Taylor can be had.

Mr. Zent avers in his affidavit that he was retained as chief counsel for appellant on March 28, 1930; that he called on Mr. Huebener, theretofore appointed counsel for appellant by the court, but found his office locked; that on March 31, 1930, affiant saw Mr. Huebener, informed him of his retainer, and asked for the files in the case and such other information Mr. Huebener had of the case; that the latter refused to deliver said files, papers, or other articles pertaining to the case, unless arrangements were made for fees; thereafter affiant attempted to get an order of court requiring Mr. Huebener to turn over the said files, etc., and was advised that the defendant alone could require his attorney to turn over said papers. This order was procured from appellant after a trip to Boise and served on April 5, 1930, when Mr. Huebener delivered the files and papers, belonging to appellant, to affiant but refused to state what action he had taken in procuring evidence except that he had information as to evidence and as to "one party material to the defense"; that he cannot inform the court as to diligence used by Mr. Huebener; that affiant had served notice to take Dr. Coffee's deposition on the prosecuting attorney "and has written to a party in Seattle, Washington, whom he is informed and has reason to believe knows the whereabouts of said eye witness to the death of the said Mary McClurg, to learn the present address of said witness." Mr. Zent likewise deposes that the said witnesses would testify as stated in appellant's affidavit.

It will be noted that the affidavits do not state what facts the witness Floyd Taylor would testify to, or when he first learned of his existence, only a mere conclusion that Mary McClurg's death was accidental. At the time the motion was made appellant had been in jail for nearly four months. He knew he was accused of the murder of his wife and under the circumstances the showing of diligence in attempting to get the testimony of Taylor and

Dr. Coffee was not sufficient. As to the latter it does not appear how his testimony was material and apparently no attempt was made to communicate with him.

A defendant on motion for a continuance, moving on the ground of absent witnesses, is required to give the names of his proposed witnesses, show what facts he intends to prove by them, that the witness is not absent by his procurement or consent, that the witness' testimony is material to his defense, that he has used diligence in attempting to procure his attendance at the trial, and has failed to do so and that there is a reasonable probability that he can and will procure his attendance at a later term if the continuance is had. (*State v. Corcoran,* 7 Ida. 220, 61 Pac. 1034; *State v. Fleming,* 17 Ida. 471, 106 Pac. 305; *State v. Rooke,* 10 Ida. 388, 79 Pac. 82.) Also holding that there is no distinction by statute in this state as to the showing required on application for a continuance in a criminal case, whether the application be made at the first, or at a later term after the indictment is returned. (See 16 C. J. 470, 499.)

We are committed to the rule that an application for continuance is addressed to the sound judicial discretion of the trial court and its ruling will not be set aside unless such discretion was abused. (*State v. Hoagland, supra; State v. McMahon,* 37 Ida. 737, 219 Pac. 603; *State v. Wetter,* 11 Ida. 433, 83 Pac. 341; *State v. Rooke, supra; State v. Rice,* 7 Ida. 762, 66 Pac. 87; *State v. St. Clair,* 6 Ida. 109, 53 Pac. 1.) The record fails to show any abuse of judicial discretion by the trial court in denying appellant's motion for a continuance sufficient to justify .a reversal of the judgment.

On April 7, 1930, appellant filed a notice of appeal from the order entered on that date denying his motion for a change of venue. He now contends that thereby the court lost jurisdiction to try the cause pending such appeal. C. S., sec. 9068, provides that the defendant may appeal from "1. A final judgment of conviction. 2. From an order denying a motion for a new trial. 3. From an

order made after judgment, affecting the substantial rights of the party." In construing this section (before its amendment adding the requirement that on appeal from a judgment of conviction if a transcript of the evidence appears in the record the sufficiency of the evidence to sustain the verdict might be considered to the same extent as though the appeal was from an order denying a motion for a new trial), this court held that the order denying a motion for change of venue is not final and therefore can be reviewed only on appeal from the final judgment. (*State v. Reed*, 3 Ida. (Hasb.) 554, 32 Pac. 202.) Under a similar statute, California, early adopted the same construction. (See 8 Cal. Jur. 493; *People v. Stillman*, 7 Cal. 117.) In 1907, the legislature provided for change of venue on application of the State (Sess. Laws 1907, p. 168) which are embodied in the Compiled Statutes as sections 8895, 8896, 8897, 8898, 8899, 8900, 8901 and 8902, which last reads as follows:

"Sec. 8902. Appeal from order denying application. The sufficiency, in both law and fact, of the application and supporting affidavits may be reviewed by the supreme court on appeal from an order of the district court denying such application, and such appeal may be taken by the state on the relation of the county attorney of the county in which such application is made, or of any other attorney duly appointed and acting in the prosecution of such cause, and the procedure governing such appeal shall be as near as may be, the same as provided by law for appeals in other criminal cases."

Conceding that this section grants a direct appeal by the State from an order denying its motion for change of venue in a criminal case not involving misdemeanors (see C. S., sec. 8895; *State v. Miles*, 43 Ida. 46, 248 Pac. 442) it does not, by its terms, grant a direct appeal from an order denying a motion for a change of venue made by defendant. We conclude, therefore, that the appeal from the order denying appellant's application for a change of venue, not being a final order, and not coming within the purview of the provisions of C. S., sec. 8902, *supra*, did not

stay the proceedings in the trial court. Such order is only reviewable on appeal from the final judgment.

In civil cases the same rule obtains and an appeal from an order denying a change of venue does not stay proceedings in the trial court. _ (*Hay v. Hay,* 40 Ida. 627, 235 Pac. 900.)

▉▉▉▉▉ Before any juror was sworn upon his *voir dire,* appellant filed in writing a challenge to the panel, upon the ground that the officers drawing the jury panel materially departed from the forms prescribed in respect to the drawing and return of the jury (C. S., sec. 8915) specifying "That the Clerk did not legally notify the sheriff and probate judge of the time and place of drawing said jury, and if the Clerk did so there is no record of the same. That there is no record kept as to who was present and took part in said drawing. That no minutes of the drawing were kept by any of the attending officers as required by the laws of the State of Idaho, to show the proceedings had or at all, and that no such minutes were signed by the clerk and attending officers and filed as provided by law."

The State excepted to the challenge and the court, deeming the exception sufficient, allowed it (C. S., sec. 8918), which is assigned as error. Under our criminal practice, an exception to a challenge to the panel amounts to a demurrer thereto and admits the facts stated therein. The exception has the same relation to the denial of the challenge as a demurrer to a complaint has to the denials in the answer in our civil practice. (*People v. Armstrong,* 2 Ida. (Hasb.) 298, 13 Pac. 342.) It was not necessary, therefore, for the court to try the challenge if it failed to state facts, which if admitted, were insufficient to sustain it. It will be noted that the challenge impliedly admits that a jury panel was drawn by the clerk in the presence of the probate judge and sheriff, as the law directs (C. S., sec. 6531) but alleges that no record of the drawing was kept as to who were present and participated therein and no minute was signed by the clerk and attending officers as required by law (C. S., sec. 6534. See *Cox v. People,* 80 N. Y. 500.) If the officers named were actually

present and participated in the drawing, whether they had notice contemplated by the statute (C. S., sec. 6530) of the time and place of drawing was immaterial. (*People v. Gallagher,* 55 Cal. 462; *State v. Yordi,* 30 Kan. 221, 2 Pac. 161.) It is not contended that a list of the persons drawn for trial jurors was not made and certified by the clerk and delivered to the sheriff, as required by said section.

A challenge to the panel can be founded only on a material departure from the forms prescribed in respect to the drawing and return of the jury, or on the intentional omission of the sheriff to summon one or more of the jurors drawn. (C. S., sec. 8915; *State v. Cosler,* 39 Ida. 519, 228 Pac. 277.) Under similar statutes, the supreme court of California held that where the board of supervisors failed to make any minute of the drawing of the jurors disclosing what trial jurors had been selected by the supervisors, and drawing a less number than required by order of the court, is not a material departure from forms prescribed by statute (see C. S., secs. 6524, 6525). "Material departures are only such as affect the substantial rights of a defendant in securing an impartial jury. . . . . " (*People v. Sowell,* 145 Cal. 292, 78 Pac. 717; *State v. Jackman,* 31 Nev. 511, 104 Pac. 13; *State v. Barnes,* 54 Wash. 493, 103 Pac. 792, 23 L. R. A., N. S., 932.) We are admonished by the statute (C. S., sec. 9191) that "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor any error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice in respect to a substantial right."

Appellant has failed to show how he was in any manner prejudiced by the failures complained of. The first jury panel, which he challenged, was exhausted and the sheriff given an open venire for twenty-five jurors. The minutes show that fifty-two persons were excused on challenge by the State, not denied by appellant, and three persons were excused on appellant's challenge, not resisted by the State. It further appears that appellant accepted the jury when he still had one unused peremptory challenge. The jury,

as finally sworn, consisted of seven men drawn from the panel challenged and five drawn from the special venire. (See *State v. Corcoran, supra.*)

The record fails to show that the errors complained of, including the failure of the clerk to enter the exception to the challenge in the minutes and which was fully argued and considered by the court below, were material departures from the prescribed procedure, or that they prejudiced, or tended to prejudice appellant as to any of his substantial rights.

Over the objection of appellant that it was not the best evidence, witnesses for the state were permitted to testify to certain statements made by appellant at the coroner's inquest upon the body of Mary McClurg. At the time of the coroner's inquest, appellant was not under arrest, had not been charged with any offense, attended pursuant to subpoena and was not warned that his statements under oath might later be used against him. This is assigned as error. In his brief, counsel for appellant urges that the admission of this evidence was violative of the constitutional rights of appellant, in that he was, in effect, compelled to give evidence against himself, which is prohibited by the fifth and fourteenth amendments to the federal Constitution, and sec. 13 of art. I of the state Constitution.

It will be noted that appellant did not object to the introduction of the testimony complained of on constitutional grounds, but because it was not the best evidence, his contention being that the transcript of the evidence taken at the coroner's inquest was the only competent evidence of what appellant testified to in that proceeding. This court has adopted the general rule that depositions taken at a coroner's inquest under our statute (C. S., sec. 9314) are not admissible on the trial of a person accused of causing the death of the person over whose body the inquest was held. The chief reason "for not allowing the introduction of depositions taken at the coroner's inquest, is that the inquest is *ex parte,* and the parties to the subsequent litigation have not had the right and opportunity

of being confronted by the witness and of cross-examination.'' (*State v. Squires*, 15 Ida. 545, 98 Pac. 413.) But, on the other hand, they are admissible like other statements and admissions of a party for the purpose of impeachment when proper foundations are laid. (*State v. Corcoran*, *supra.*) Against the objection that oral testimony as to what appellant testified to at the coroner's inquest is not the best evidence, the court did not err. (16 C. J. 613; *State v. Lazarone*, 130 La. 1, 57 So. 532.)

 *State v. Squires*, *supra*, does not go to the extent of holding that voluntary admissions, made by defendant being tried for murder, as a witness at the coroner's inquest over the body of the deceased, are, under no conditions, admissible in evidence. It simply holds that such testimony cannot be proven by the transcript of the evidence taken at the inquest. Any person, otherwise competent to testify, may testify as to what the defendant said in his testimony. (See *Bennett v. State*, 66 Fla. 369, 63 So. 842; *State v. Lazarone*, *supra*; *Green v. State*, 124 Ga. 343, 52 S. E. 431.)

It is competent to make such proof by members of the coroner's jury (*Pruett v. Commonwealth*, 199 Ky. 35, 250 S. W. 131) or the coroner (*People v. Strollo*, 191 N. Y. 42, 83 N. E. 573).

 Appellant was not deprived of his right to have any part of his testimony at the inquest presented to the jury on his trial for murder, provided he presented it by the testimony of witnesses who were present at the inquest and heard his testimony. It is usual in such cases to swear the person who took down and transcribed the testimony at the coroner's inquest and prove by him what any witness testified to thereat. Appellant failed to follow this method, or that adopted by the state, but stood on his offer to introduce the transcript itself. If he was not fully or correctly quoted by the witnesses for the state he was privileged to refute or add to the witnesses' version of his testimony, or correct inaccuracies therein by his own testimony. (*People v. Heacock*, 10 Cal. App. 450, 102 Pac. 543.) By the great weight of authority, if the testimony

is voluntarily given at the coroner's inquest, admissions of the defendant, afterwards charged with the murder of the deceased, made as a witness at said inquest are admissible. (13 R. C. L. 930; 16 C. J. 629; *Evans v. State*, 199 Ind. 55, 155 N. E. 203; *Wilson v. State*, 110 Ala. 1, 55 Am. St. 17, 20 So. 415; *Hendrickson v. People*, 10 N. Y. 13, 61 Am. Dec. 721; *Teachout v. People*, 41 N. Y. 7; *Woolfolk v. State*, 81 Ga. 51, 8 S. E. 724; *Davidson v. State*, 135 Ind. 254, 34 N. E. 972; *Epps v. State*, 102 Ind. 539, 1 N. E. 491.) Although, there is authority to the contrary. (*Tuttle v. People*, 33 Colo. 243, 3 Ann. Cas. 513, 79 Pac. 1035, 70 L. R. A. 33; *State v. O'Brien*, 18 Mont. 1, 43 Pac. 1091, 44 Pac. 399; *State v. Young*, 119 Mo. 495, 24 S. W. 1038; *State v. Clifford*, 86 Iowa, 550, 41 Am. St. 518, 53 N. W. 299.)

The better rule is that where one is called and sworn as a witness at a coroner's inquest, not then being under arrest, nor accused of crime and testifies as such witness, under oath, his so given statements are regarded as voluntary and may be given in evidence against him on a trial for the murder of the deceased over whose body the inquest is held, even where he was not cautioned as to his rights before giving his testimony at the inquest. (*Wilson v. State, supra; People v. Molineux*, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193; *Hendrickson v. People, supra; State v. Finch*, 71 Kan. 793, 81 Pac. 494; *Epps v. State, supra; Shiefel v. State*, 180 Wis. 186, 192 N. W. 386; *Williams v. Commonwealth*, 29 Pa. 102; *Evans v. State, supra; Shoeffler v. State*, 3 Wis. 823; *People v. Coen*, 205 Cal. 596, 271 Pac. 1074; *Pruett v. Commonwealth, supra*.)

In some jurisdictions it is held that before the defendant's admissions made under oath at the coroner's inquest can be introduced against him on trial for murder of the deceased, it must be shown that the coroner, or other person conducting the examination of witnesses at the inquest warned the defendant before he gave his testimony that it might be used against him. (*Standifer v. State*, 24 Ga. App. 329, 100 S. E. 775; *State v. Tapp*, 105 S. C. 55, 89 S. E. 394.)

Counsel for appellant does not argue his constitutional objections further than to say that appellant being sworn at the coroner's inquest and not warned that his testimony might subsequently be used against him, in effect, was compelled to become a witness against himself by the admission of testimony of witnesses who heard his testimony as to what he testified on that occasion. He cites two cases, *United States v. Abrams*, 230 Fed. 313, involving the use of documents unlawfully taken from the possession of a defendant by officers of the government, and has no application to the precise point here, and *Downing v. State*, 61 Tex. Cr. 519, 136 S. W. 471, in which a wife was subpoenaed to bring in a trust deed which contradicted the testimony of her husband at a former trial, the court holding the evidence inadmissible under a statute prohibiting a wife from testifying against her husband. She could not, of her own volition, produce it, and it was error to compel her to. That which could not be accomplished directly could not be accomplished indirectly. The facts of this case bear no analogy to the facts or principles controlling here.

The fifth amendment to the Constitution of the United States, providing among other things, that no person "shall be compelled in any criminal case to be a witness against himself," has consistently been held to be a limitation upon the powers of the federal government, and has no reference to the exercise of such powers by the state governments. (*Twining v. New Jersey*, 211 U. S. 78, 29 Sup. Ct. 14, 53 L. ed. 97; *Ex parte Spies*, 123 U. S. 131, 8 Sup. Ct. 22, 31 L. ed. 80; *State v. Lloyd*, 152 Wis. 24, Ann. Cas. 1914C, 415, 139 N. W. 514; *Davison v. Guthrie*, 186 Iowa, 211, 172 N. W. 292. See *Brown v. Walker*, 161 U. S. 591, 16 Sup. Ct. 644, 40 L. ed. 819; *Maxwell v. Dow*, 176 U. S. 581, 20 Sup. Ct. 448, 44 L. ed. 597; *Barron v. Baltimore*, 7 Pet. (U. S.) 243, 8 L. ed. 672; *Twitchell v. Commonwealth*, 7 Wall. (U. S.) 321, 19 L. ed. 223.)

The adoption of the fourteenth amendment did not have the effect of enlarging the fifth amendment to the federal

Constitution so as to make it, in effect, operate upon the powers of the states as well as the powers of the federal government. (*Twining v. New Jersey, supra; Maxwell v. Dow, supra.*)

Article I, sec. 13, Const. of Idaho, contains the identical clause as to compelling a person in a criminal case to be a witness against himself, no person shall "be compelled in any criminal case to be a witness against himself." Similar constitutional provisions have generally been interpreted to confer the right upon a witness to refuse to give evidence upon the ground that it may incriminate him, but he may waive the privilege and generally does so when he produces evidence or answers questions without objecting. (*State v. Lloyd, supra.*) And, while it is proper to inform the witness of his right to refuse to answer, under ordinary circumstances, where no statute requires it, if the witness possesses ordinary intelligence and is not under duress, it is not necessary to inform him of his right to refuse to answer under this constitutional provision. (*State v. Lloyd, supra; Shoeffler v. State, supra; Pruett v. Commonwealth, supra.*)

On redirect examination, the insurance agent, Hower, testified that appellant called at his office December 7, 1929, and again on December 9, 1929, and asked if the insurance was in force on two policies, one on his own life and one on Mary McClurg's life. He also testified that some other business was mentioned. On recross-examination he testified he had some talk with appellant about some other deals, or dealing with appellant; the appellant came to witness' office several times to talk over other matters. The following then occurred:

Mr. Zent: "Besides the insurance application you had other business deals pending with him, didn't you?"

Mr. Delana: "Save an exception for the record."

The Court: "You may answer, yes or no."

A. "No, there was no other business deal, I can say that, Mr. Zent."

Q. "Wasn't there any other pending?"

A. "Well, I am perfectly willing to state what it was, what the discussions were."

Q. "I think we are entitled to know."

The Court: "If it has anything to do with this insurance."

A. "It doesn't have a thing to do with the insurance."

Mr. Zent: "The witness testified on direct examination that he talked about other matters and that he asked about the insurance."

The Court: "I think the matter is in the record."

Mr. Zent: "Objection sustained."

The refusal of the court to permit further inquiry as to the other business is assigned as error. While it was material to show that appellant went to this witness on other business not connected with insurance policies, that fact was brought out by appellant's counsel and it was immaterial what the other business was. The extent to which the cross-examination on collateral or immaterial issues may be limited is largely in the discretion of the trial judge. (*State v. Mox Mox*, 28 Ida. 176, 152 Pac. 802.) The ruling of the court was not error.

For the purpose of attempting to show motive for the crime, the State offered in evidence a certified copy of a complaint for divorce filed August 21, 1929, in the superior court of Stanislaus county, California, wherein Ena M. McClurg is plaintiff and John C. McClurg, is named as defendant. The court, over objection, permitted the formal parts of this complaint to be read into the record, but excluded all references to the grounds of divorce. Appellant assigns the admission of any part of this complaint as error. The serious question presented by this assignment is whether appellant was sufficiently identified as the person named in the complaint. Appellant stated, in effect, before his arrest that deceased was his fourth wife. The witness, Bolling, testified that he knew appellant and his wife, Ena McClurg, and that they lived together at Grant's Pass, Oregon, about three years before the date of the trial. On cross-examination, William McClurg, brother of appellant, testified that Hower, the insurance agent who received the applications of appellant and deceased for life insur-

ance, called on appellant while in bed at William McClurg's home shortly after the death of Mary McClurg. Hower told appellant he would have to have some pictures. He got some pictures and the proceedings in a divorce case of appellant's, some papers of some kind, the witness could not tell what they were.

In general, proof of the existence at a particular time of a fact of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time. (22 C. J. 86.) Having shown that appellant, John C. McClurg, and Ena McClurg were husband and wife, living together as such, at Grants Pass, Oregon, three years prior to the trial, there is an inference that the marriage continued until the filing of the complaint in divorce, in August, 1929. (Underhill on Criminal Evidence, 2d ed., sec. 383; *State v. Eggleston,* 45 Or. 346, 77 Pac. 738; *Banks v. State,* 96 Ala. 78, 11 So. 404; *State v. Weatherby,* 43 Me. 258, 69 Am. Dec. 59.) While there is no direct identification of appellant as the defendant in the divorce action, the names of the parties being the same, there is an inference of fact that the identity of names indicates an identity of persons. (22 C. J. 92; 10 R. C. L. 877; *State v. Woods,* 274 Mo. 610, 204 S. W. 21; *State v. Herren,* 173 N. C. 801, 92 S. E. 596.)

Since the evidence objected to goes to proof of motive, a fact not necessary to prove if the evidence of guilt is otherwise sufficient, we hold that the State made *prima facie* proof entitling the divorce complaint, properly certified, to admission in evidence.

Appellant urges that, in any event, the divorce complaint was not admissible, citing 16 C. J. 445, sec. 1036, to the effect that "acts, transactions and occurrences with which accused is not shown to have any connection are not admissible in evidence against him." The proof showed appellant was married to Ena M. McClurg and that after living with Mary Emerick, for three weeks, he married her on October 14, 1929, while the divorce action was still pending, since under the California statute (Cal. Civ. Code, secs. 130, 131, 132) a final judgment could not be entered

therein in any event before one year from the date of the interlocutory decree provided for in Cal. Civ. Code, sec. 130. This marriage relation would not be severed until final decree under Cal. Civ. Code, sec. 131. (*Brown v. Brown*, 170 Cal. 1, 147 Pac. 1168; *In re Newman*, 88 Cal. App. 186, 262 Pac. 1112.)

Appellant, at the date of the tragedy, had previously attempted to marry Mary Emerick, without the divorce from his wife, Ena M. McClurg, being granted and was, therefore, open to prosecution for bigamy. At least, it may be inferred that he thought he was liable to such prosecution. (*People v. Le Doux*, 155 Cal. 535, 102 Pac. 517.) The testimony was clearly admissible as tending to show motive for the killing and as rendering more probable the inference that appellant did kill Mary McClurg. (Underhill on Criminal Evidence, 3d ed., sec. 503; Nichols, Applied Evidence, p. 3146, sec. 14; Wigmore on Evidence, 2d ed., sec. 390, p. 712; 30 C. J. 180; *People v. Le Doux, supra*.) The evidence was not offered to convict appellant of bigamy, or adultery, but to establish a motive for killing his supposed wife.

Appellant assigns as error the admission of the testimony of Lucy Matthews and Pauline Maier, describing an auto ride with appellant, Mary McClurg (both of whom had been drinking), one Joe Parrott and the two women named, some time in November, 1929, from Caldwell toward Sunnyslope. During the progress of the ride Mary McClurg became ill, vomited and the car was stopped twice. The witnesses testified to appellant cursing and using vile epithets toward his wife; slapping her and holding her on her back on the seat when she commenced to vomit and when remonstrated with by his companions, remarking, in effect, that killing was too good for her. That Mary told appellant not to strike her, she didn't care for herself but it was for the baby that was coming. Parrott attempted to interfere when appellant told him it was a family affair and for him to keep out of it; that he had a gun and might shoot any time. Subsequently, the parties agreed not to quarrel and returned to Nampa where Lucy Mat-

thews lived. It may be stated that the evidence of both women substantially agrees and that Pauline Maier's testimony went in without objection of any kind by appellant. He did object ''to this entire line of testimony as being incompetent, irrelevant and immaterial, no bearing on the case, whatsoever,'' after Lucy Matthews had described the personnel of the party and their setting out on the ride, which objection was overruled. · Later, he interposed the same objection to Matthews' testimony which was also overruled by the court. And later still, after he had started cross-examination of Lucy Matthews, moved to strike all her testimony. Having permitted the testimony of Pauline Maier to go in without objection, appellant could not have been prejudiced by the previous testimony of the witness Lucy Matthews. But, in any event, appellant was charged with the murder of the woman he was holding out as his wife. Their relations shortly prior to the killing, whether pleasant or otherwise, were admissible upon the question of motive. (This is the rule between husband and wife (30 C. J. 184, 408), so is evidence of feelings of defendant toward victim (30 C. J. 182, 407).) We hold ·that the evidence of both these witnesses was admissible to prove motive and the court did not err in admitting it.

The admission of the testimony of state's witnesses, Floyd Bolling and Loeta Baker, is likewise assigned as error. Bolling testified that he knew Mary McClurg and appellant for about three weeks before they were married, during which time they lived together as man and wife; that appellant asked him to be a witness at the marriage, that Mary was in the family way and he had to marry her; they both wanted to get rid of the child; means to that end were discussed by them half a dozen times. Without objection, the witness testified that the McClurgs discussed the matter; that appellant told him they went to a doctor in Yakima who wanted $60 to get rid of the child and appellant told her they would get rid of it; she said she was going back to Seattle and appellant accused her of having a sailor there she was going to see. He also testified, without objection, that on another occasion appel-

lant told Mary that if she left him he would kill her and himself, too, that life would not be worth living without her; that on another occasion when Mary did not want to go to a party, McClurg, then under the influence of liquor, stated if she didn't go he would get another girl and she then went. The witness Loeta Baker testified substantially to the same matter as to the relationship between appellant and Mary as did Bolling, and in addition, testified to appellant having made indecent advances to her when she, Bolling and the McClurgs were in the same hotel.

What has heretofore been said as to evidence tending to show motive applies to these assignments of error. Clearly, the evidence was admissible as tending to show the relationship between appellant and deceased as bearing upon the question of motive.

Evidence of unwilling marriage by appellant is admissible to rebut the presumption of affection for one another. (*Nordan v. State,* 143 Ala. 13, 39 So. 406.) The fact that both appellant and Mary knew she was enceinte by him and both wanted to prevent the birth of the child tended to show a motive on the part of the appellant to escape from his difficulties, having not yet been divorced from Ena McClurg, his lawful wife.

Before appellant finished introducing his evidence, his counsel, in its absence, requested that the jury be taken "to the scene of the wreck described in the evidence here, that they may view the condition of the hillside and the conditions there that are not changed." Counsel for the state resisted the motion upon the ground that the physical conditions had changed since the car went over the grade, etc. The court ordered that the sheriff, M. E. Dillon, be directed to conduct the jury to view the place at which the offense is charged to have been committed. That the place might be shown to the jury by O. W. Emanuel, who was admonished by the court, "You will point out the place where the car left the road and nothing more. You are not to answer any questions on behalf of any juror or anyone else, except to indicate to them where the car left

the road." The sheriff was then sworn as bailiff, after which the record shows the following:

Mr. Delana (special prosecutor): "Is the jury permitted to go over the ground?"

The Court: "If you gentlemen agree to that."

Mr. Zent: "To point out the place where the car left the road and the place where it landed."

Mr. Haag (prosecuting attorney): "We agree to that."

Neither the defendant, nor his counsel, nor the trial judge accompanied the jury on the view, had April 12, 1930. No objection was raised during the trial, which was resumed in the afternoon, after the jury had returned from the view, when appellant finished putting in the testimony of his witnesses. On motion for a new trial, appellant for the first time, urged the objections; that the court erred in not causing the defendant to be taken on the view by the jury; in not accompanying the jury to view the premises; in appointing the sheriff who was an interested witness for the plaintiff to take the jury to view the premises; and in appointing O. W. Emanuel, the deputy sheriff, a biased and prejudiced witness, to accompany the jury and point out certain evidence without the trial judge or defendant being present.

By affidavits, on information and belief, appellant sought to show on motion for a new trial, that the jury disregarded the injunction of the court and took evidence at the view of the premises. The positive affidavits of the members of the jury and officers having them in charge deny that any evidence was received, or that the officers pointed out anything more than the places where the car left the road and eventually landed in the gulch. Apparently, appellant has abandoned the position that any prejudicial evidence was received by the jury, since that is not assigned as error and is not argued on this appeal. Therefore, it must be assumed that there was no prejudice to appellant, on account of the receipt of improper evidence, etc.

C. S., sec. 8964, reads:

"Sec. 8964. View of premises by jury. When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of the sheriff, to the place, which must be shown to them by a person appointed by the court for that purpose, and the sheriff must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time."

C. S., sec. 8905, reads:

"Sec. 8905. Presence of defendant. If the indictment is for a felony, the defendant must be personally present at the trial; but if for misdemeanor, the trial may be had in the absence of the defendant."

In an early case, *State v. Reed,* 3 Ida. (Hasb.) 754, 35 Pac. 706, this court in construing what is now C. S., sec. 8964, *supra,* held the presence of the defendant at a view could be waived and said, "While we think it advisable, in all such cases, to permit the defendant to be present at such view, if he so desires, we think, where neither the defendant nor his counsel expressed such desire, and where the view was had on motion of defendant, and the record does not disclose anything improper, or that can be construed as prejudicial to defendant, took place at or during the view no such error has been committed as would justify reversal."

In the subsequent case of *State v. McGinnis,* 12 Ida. 336, 85 Pac. 1089, while criticising certain statements in the opinion in *State v. Reed, supra,* said: "We have no doubt of the right of a defendant to be present at such an examination and inspection in any and every case where he requests that privilege. We are not prepared, however, to say that he may not waive such right and privilege." In that case the conviction was affirmed although the defendant was not present at the view.

Where this court had under consideration the failure of the trial judge to be present at a view, the defendant not

having requested his presence thereat (as in the case here), this court said: "As the view of the premises was had without the presence of the judge by defendant's consent, that is his failure to object, he cannot here be heard to complain. The matter complained of here is at most only an irregularity which should have been objected to at the time of its performance. . . . . "

"While we think it advisable in all criminal cases for the trial judge to accompany the jury and the defendant upon a view of the premises, we think that where the defendant failed to except to the absence of the judge or request the judge to accompany the jury, and where the view was had by the consent of the defendant, and the record does not disclose anything improper or that can be construed as prejudicial to the defendant, took place at or during the view, no such error has been committed as would justify a reversal." (*State v. Moon,* 20 Ida. 202, 220, Ann. Cas. 1913A, 724, 117 Pac. 757. See *People v. White,* 5 Cal. App. 329, 90 Pac. 471.)

In a later case, having the same statute under consideration, in considering misconduct of the jury at a view of the premises, at which defendant and his counsel were both present, held: "It follows that if misconduct occurs in his presence, he should take the first opportunity to present such error to the trial judge for action, and in the absence of a showing to the contrary, 'the first opportunity' will be considered to be upon the return of the jury from the view." (*State v. Baker,* 28 Ida. 727, 738, 156 Pac. 103.)

The record fails to show that appellant requested the attendance of the trial judge at the view, or of appellant himself to accompany the jury, or that he made prompt objection to the failure of the trial judge to attend or order the attendance of appellant. He must, therefore, be deemed to have waived any objection on account of such failures to attend the view, in the absence of a showing of anything improper to have transpired at the view tending to prejudice the appellant.

Nor was it error to put the jury in the custody of the sheriff, which the statute, C. S., sec. 8964, expressly

directs shall be done during the view, or to direct that the deputy sheriff, O. W. Emanuel, should point out the points designated by agreement of counsel.

There was no objection made to these appointments until the motion for a new trial and there is no evidence substantiating any charge of bias or prejudice on the part of either officer. We hold that where timely objection is not made to the appointment of these officers in the capacities mentioned, under the circumstances of this case, appellant waived his right to object thereto.

Exception is taken to the court's instruction No. XXIV, which is as follows:

"The jury has been allowed to view the premises where the alleged homicide is testified to have taken place. You are instructed that what you observed during the inspection of the premises can in no case become evidence, nor are you entitled to take it into consideration in arriving at your verdict in this case, except as a means to better understand and apply the testimony which has been produced here at the trial."

In construing C. S., sec. 8964, this court held: "The purpose of the statute is not to permit the taking of evidence out of court, but simply to permit the jury to view the place where the transaction is shown to have occurred, in order that they may the better understand the evidence which has been introduced." (*State v. Main,* 37 Ida. 449, 459, 216 Pac. 731.) In construing C. S., sec. 6850, authorizing a view in civil cases, we have held that the jury should be instructed "to the effect that they could only use the knowledge obtained by their view of the premises in determining the weight and applicability of the evidence introduced at the trial, and that a view of the premises does not supply a want of evidence and is not of itself evidence upon which a verdict may be based." (*Tyson Creek R. R. Co. v. Empire Mill Co.,* 31 Ida. 580, 590, 174 Pac. 1004.)

The instruction complained of substantially states the law and it was not error to give it.

At the close of plaintiff's case appellant's counsel handed the court a written motion to peremptorily in-

struct the jury to return a verdict of not guilty and asked
to have the jury excused. The court answered that at the
first recess the motion might be dictated into the record
and the ruling thereon that it be denied. This is assigned
as error. The motion to peremptorily instruct the jury
to acquit is not known to our practice. Where the evidence
is insufficient the court may advise the jury to acquit the
defendant (C. S., sec. 8963), although this advice is not
binding on the jury who must be so instructed. However,
the refusal to give the instruction advising the jury to
acquit is not reversible error and is not reviewable in this
court. (*State v. Stevens,* 48 Ida. 335, 282 Pac. 93, where
the Idaho authorities are collated.) Appellant could not
be prejudiced by the refusal to cause the jury to retire,
since neither the court nor counsel referred to the motion
by name, nor disclosed its contents to the jury. The court
simply saying he was of opinion that the motion should
be read into the record as well as filed, and respondent's
counsel stating such procedure was agreeable to plaintiff.
Appellant assigns as error the failure to give the following
instructions proposed by him, viz.:

"First.

"You are further instructed that in order to justify
a verdict of guilty the plaintiff must:

"1. Prove that a crime has actually been committed.

"2. That the defendant committed the crime;

"3. That under the law where the evidence is entirely
circumstantial, as in this case, these elements must be proven
by evidence of a most cogent and irresistible kind. That
they must be proven beyond a reasonable doubt and to a
degree to exclude every other hypothesis.

"Second.

"You are further instructed that the failure of the
defendant to testify raises no presumption of guilt and
that in this case you are not to take any presumption of
guilt of the defendant by reason of his failure to take the
witness stand and testify."

In his Instruction No. XV, the court told the jury that
the state was called upon to prove the *corpus delicti,* de-

fining the term to mean that a crime has been committed and that the defendant on trial committed it. If the state had made it appear to the jury's satisfaction beyond a reasonable doubt, the state had made out its case, if not, then it had not made out its case, and continuing, charged, "The *corpus delicti* can be established by circumstantial evidence, providing it is sufficient to convince the jury to the exclusion of every reasonable doubt, but it cannot be proved by the statements of the defendant standing alone. But the statements, if found by you to be voluntary and free from the objections hereinafter set out, taken in connection with all the circumstances in the case, convinces you to the exclusion of every reasonable doubt that Mary McClurg is dead, that she died by criminal violence, that the defendant unlawfully killed her with malice aforethought from a premeditated design to effect the said deceased's death, that it was done in the County of Gem, in the State of Idaho, on or about the time alleged in the information and before the filing thereof, then it would be your duty to find the defendant guilty."

Appellant contends that where the evidence is circumstantial these two elements must be proved "by evidence of the most cogent and irresistible kind." That they must be proven beyond a reasonable doubt and to exclude every other hypothesis. The court told the jury in Instruction No. XV, *supra,* that "the *corpus delicti* can be established by circumstantial evidence, providing it is sufficient to convince the jury to the exclusion of every reasonable doubt. . . . . " Again, in Instruction No. XX, he told the jury that the facts and circumstances of the circumstantial evidence must be sufficiently conclusive to convince the jury to a moral certainty and beyond a reasonable doubt. The twenty-first instruction reads as follows:

"You are instructed that in order to warrant a conviction for crime on circumstantial evidence, the circumstances taken together should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing in effect a reasonable and moral certainty that the accused and no one else committed the offense charged;

and it is the invariable rule of law that to warrant a conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with the guilt of the party charged, and as cannot, upon any reasonable theory, be true and the party charged be innocent; and in this case if all the facts and circumstances relied upon by the State to secure a conviction can be reasonably accounted for upon any theory consistent with the innocence of the defendant, then the jury should acquit the defendant.''

It will be observed that the court substantially covered in his instructions everything asked for in appellant's first proposed instruction, except that he did not incorporate the phrases ''by evidence of the most cogent and irresistible kind,'' and ''to a degree to exclude every other hypothesis.'' It is true that the first quoted phrase was used in the opinion of this court in *State v. Sullivan,* 34 Ida. 68, 199 Pac. 647, 17 A. L. R. 902, in the alternative, where the court said (p. 74) : ''But the authorities still all hold that where the proof is made by circumstantial evidence, it must be established so as to positively exclude all uncertainty, and be sufficient to satisfy the understanding and conscience of the jury beyond a reasonable doubt; or, as expressed by many of the writers, 'The *corpus delicti* ought to be proved either by direct testimony or by presumptive evidence of the most cogent and irresistible kind.' ''

Later, in construing the rule laid down in *State v. Sullivan, supra,* the author of the opinion in that case said: ''We adhere to the view that under well settled principles of criminal law a conviction for a crime cannot be had unless the *corpus delicti,* that is, the fact that a crime has been actually committed has been first established. But it is there stated that the *corpus delicti* may be shown by circumstantial evidence where the proof is of such character as to exclude all uncertainty.'' (*State v. McLennan, supra.*)

In *State v. McLennan, supra,* the defendant was charged with murder and the court, in addition to giving Instruction No. XV herein, also instructed the jury that to base a verdict of guilty upon circumstantial evidence, the circum-

stances must be consistent with guilt, and inconsistent with innocence, and incapable of explanation on any other reasonable hypothesis than that of guilt. This court held the instructions to be sufficient in that case and we conclude the instructions in the case at bar were sufficient.

The proposed instruction does not state the law for the reason that it says, in effect, that the *corpus delicti,* where the evidence is entirely circumstantial, must be proven beyond a reasonable doubt and "to a degree to exclude every other hypothesis" than that of guilt.

The authorities are uniform in holding that every hypothesis other than that of guilt need not be excluded, but only every other *reasonable* hypothesis, etc. This is the gist of the court's statement in Instruction No. XXI. (*State v. Marcoe,* 33 Ida. 284, 193 Pac. 80; *State v. McLennan, supra; State v. Dawn,* 42 Ida. 210, 245 Pac. 74; *State v. Peters,* 43 Ida. 564, 253 Pac. 842. See, also, *Bowen v. State,* 140 Ala. 65, 37 So. 233; *State v. Glass,* 5 Or. 73; *Carlton v. People,* 150 Ill. 181, 41 Am. St. 346, 37 N. E. 244; *State v. Yancey,* 47 Ida. 1, 272 Pac. 495.)

As to the second proposed instruction the matter was fully covered by Instruction No. XXIII, to the effect that the defendant is not required to testify and "the mere fact that he does not testify raises no presumption or prejudice against him and the jury must not, on that account, draw any unfavorable inference against the defendant who does not offer himself as a witness."

The court did not err in refusing to give any of appellant's proposed instructions.

Appellant complains of the court's Instruction No. XIII, to the effect that it devolves upon the State to prove wilfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, that they need not be proved by direct evidence, "but may be deduced from all the facts and circumstances of the killing; and if you can satisfactorily and reasonably infer their existence from the evidence you will be warranted in finding the defendant guilty of murder in the first degree." The objection urged is, that

this instruction fails to charge that these facts must be proven beyond a reasonable doubt and to the exclusion of any other reasonable hypothesis. The instruction properly states the law. (*State v. Hulbert,* (Mo.) 228 S. W. 499; *State v. Brown,* 188 Mo. 451, 87 S. W. 519.) Instruction No. III, that in order to find the defendant guilty the jury must be satisfied of his guilt beyond a reasonable doubt and that the proof is not only consistent with his guilt but inconsistent with his innocence, read with Instructions XX and XXI, fully state the law, as applied to a case depending upon circumstantial evidence.

Appellant attacks Instruction No. XV to the effect that the *corpus delicti* must be proven beyond every reasonable doubt, because it does not add that in cases where the evidence is entirely circumstantial, it must be proven to the exclusion of every other reasonable hypothesis. This element is fully covered in Instruction No. XXI as to circumstantial evidence. Instruction No. XV is identical with an instruction sustained in *State v. McLennan, supra.* A similar objection is made to Instruction No. XX, the omission being covered by Instruction No. XXI.

It is well settled under our practice that instructions must be read, considered and applied as a whole. (*People v. Bernard,* 2 Ida. 193, 10 Pac. 30; *Territory v. Evans,* 2 Ida. 425, 17 Pac. 139; *State v. Bond,* 12 Ida. 424, 86 Pac. 43; *State v. Ramirez,* 33 Ida. 803, 199 Pac. 376; *State v. Dong Sing,* 35 Ida. 616, 208 Pac. 860; *State v. Jurko,* 42 Ida. 319, 245 Pac. 685.) The court's charge contained an instruction to the effect that they be considered together which was proper. (*State v. Dunlap,* 40 Ida. 630, 235 Pac. 432.)

Appellant assigns error in giving Instruction No. XXVIII, defining reasonable doubt. He cites no authority, nor points out any objection to the instruction. We have carefully read the instruction and conclude that it fairly states the law on the subject.

Appellant cites no authority for his contention that it was incumbent upon the trial court to serve him with a copy of the court's instructions that he might have

proper opportunity to object and except to any or all of them. C. S., sec. 9040, provides for entry of judgment after its rendition, and that certain papers therein mentioned, including, ''7. The written charges asked of the court, and refused with the court's endorsement thereon. 8. A copy of all requested instructions showing those given and those refused with the court's endorsement thereon, together with a copy of all instructions given on the court's own motion,'' shall be annexed together and filed by the clerk, the same constituting the record of said action.

While it is good practice in this state to do so, the statute does not require that the trial judge serve. a copy of his instructions upon litigants, or their counsel, before argument, or at all. C. S., sec. 9040, does not require the record mentioned therein, including all instructions requested, or given by the court on his own motion, to be filed by the clerk until after the rendition of judgment. In the instant case, whether the instructions were filed as required by C. S., sec. 9040, does not appear from the record before us. It does show the written charges asked of the court and refused with the court's indorsements thereon, and the date of filing by the clerk, and all instructions requested, those given and those refused, and those given of the court's own motion, all of which are deemed excepted to, and as they appear in the transcript, may be considered on appeal. (Sess. Laws 1927, chap. 24, p. 28.) It does not appear how the substantial rights of appellant have been in any way prejudiced by delay in filing the instructions, or failure to file the same, since he has been able to have them reviewed by this court, on the ·record presented. This objection is not well taken. (C. S., sec. 9191. See *State v. Hunsaker*, 37 Ida. 413, 216 Pac. 721; *State v. McBride*, 33 Ida. 124, 190 Pac. 247.)

Appellant assigns as error the denial of his motion in arrest of judgment. The grounds of the motion are stated substantially as follows: That the information does not substantially conform to the requirements of C. S., secs. 8825, 8826 and 8827; the information does not state facts sufficient to constitute a public offense; that the dis-

trict court had no jurisdiction from and after the filing of the notice of appeal from the order denying a motion for change of venue; the court erred in denying defendant's application for a continuance of the trial; and that defendant did not have a fair and impartial trial by jury.

C. S., sec. 9019, provides that a motion in arrest of judgment "may be founded on any of the defects in the indictment that are grounds for demurrer, unless the objection has been waived by a failure to demur, and must be made before or at the time the defendant is called for judgment."

Defendant demurred, as has been shown, to the information upon the grounds that it did not substantially conform to the requirements of C. S., secs. 8825, 8826 and 8827, and the facts stated do not constitute a public offense. We have hereinbefore held that the demurrer was properly overruled. Since the other matters stated in the motion in arrest of judgment are not grounds for demurrer (nor are they stated in the demurrer), to the information, they cannot be considered on motion in arrest of judgment. (*State v. Knutson,* 47 Ida. 281, 274 Pac. 108; *People v. Shotwell,* 27 Cal. 394. See *State v. Severns,* 47 Ida. 246, 273 Pac. 940; *State v. Fong Wee,* 47 Ida. 416, 275 Pac. 1112; *People v. Roe,* 58 Cal. App. 690, 209 Pac. 381; *People v. Perfetti,* 88 Cal. App. 609, 264 Pac. 318; *State v. Hastings,* 54 N. D. 878, 211 N. W. 816.)

Appellant contends that the evidence is wholly insufficient to justify the verdict and that there is no proof of the *corpus delicti.* The evidence shows, among other things, that appellant and deceased left Caldwell on the night of December 9th, 1929, after 6 and before 7 o'clock P. M. in a one-seated 1926 Model T Ford Coupe. About 9:30 o'clock P. M. on that date appellant appeared at the home of one Wirt Kennedy, six or seven miles southeast of Emmett and hallooed. Kennedy went to the door with a light and found appellant on his knees about thirty feet north and east of his house. He informed Kennedy that his back and hips were hurt and asked him to accompany him to a wreck he had had on the hill, saying his wife was fastened to the car and that it was afire; that he wanted help to get

her out; inquired if Kennedy had a hook to get her out with. The car was about a mile, as the crow flies, and a mile and a quarter by the road, from Kennedy's home. Appellant got into Kennedy's car without assistance and they drove to the scene. Kennedy helped appellant down to the wreck. The car was standing upright in a gulch or ravine running east and west, with its front wheels across the bottom of the gulch and the rear wheels in it. Everything of a combustible nature about the car was burned, except the wheels and tires on the right side which were not badly burned, the tires on that side still being inflated with air. There was some fire in the left front wheel and under the left rear wheel when they reached the wreck. The fan belt was not burned. The front axle was sprung and the wishbone bent. Glass was broken and had fallen inside the car, some of it had melted and some was upon the ground near the car, although none appeared along the route the car had taken down the hill from the road above. The car fenders were intact and unbent and there was no indication from an examination of the route followed by the car that it had turned over on its way down. Subsequently, it was discovered that the gas line and exhaust pipe were broken and pulled loose. The charred body of a woman, obviously pregnant, was on the left running-board of the car, facing inward, leaning slightly forward, with the right leg extending back along the running-board. This leg was broken above, and was burned off, nearly to the knee. The left leg extended out from the car, was burned very little below the knee and still had a stocking on it. Both arms were burned off nearly to the shoulders and the face and top of the head were also burned off. Appellant told Kennedy that his fourth wife was gone; that he and deceased had smelled smoke near the top of the hill; that when his wife lifted the floor boards the smoke rushed into their faces, after which the car lights went out. Subsequently, he told Dr. Reynolds that the lights went out first; that the car started to roll down and he tried to persuade his wife to get out and she said to stay with the car; that he told her two or three

times to jump out and she said, "No, Daddy, don't jump, stay with me"; and that appellant said he wished he had stayed and gone over with her, but when the car went over the grade he jumped. He told Kennedy that, unable to control the car, he urged his wife to jump and that she replied, "Daddy, don't jump." Appellant told the sheriff that he walked down the hill to the wreck and "came to" wandering around in the sagebrush below; that he tried to pull his wife out of the car, but her clothing came loose and he burned his hands and "passed out" again.

A pair of ladies' pumps belonging to deceased were later found in the relative position of each foot. The undamaged right shoe under the left foot which was not burned and the left, somewhat burned, was found under where the right foot would have been if not burned off. Appellant told the sheriff and a detective that he had found one of the deceased's shoes up the hill but did not know what he had done with it. An examination of the ground revealed that the car had skidded to a stop 123 feet from where it left the road near a turn, 150 to 200 feet from the top of the hill and 150 feet from where the car burned. The car was traced down the very steep hill by its tracks which were visible, except where obstructions were encountered and the car jumped. There was no evidence of fire along the route followed by the car nor any indication of its having turned over. A pair of pliers were found from six to fifteen feet above the car. There were slight blood stains thereon which upon analysis were determined to be human blood. The back cushion of the car seat was found twelve to twenty feet down the draw and back from the car. The estimated distances vary in the accounts of the several witnesses. When found the cushion was lying upholstered side down. A damp blood stain (analysis showing it to be human blood) that had soaked through the cover and into the felt padding, appeared on the upper right-hand side of the cushion, assuming it to be in proper place and position in the car. There was also a blood "smear" across the cushion cover to the left and below the first-mentioned spot.

806

Appellant told the sheriff that the blood on the cushion came from his face which was slightly scratched and bleeding when he came to Kennedy's house. Later he said he did not think the blood on the cushion came from his face.

From the autopsy held next day it appears: There was a fracture near the base of the skull three and one-half inches long, inflicted prior to burning. There was clotted blood in the stomach and lungs drawn in before death, apparently; four or five ounces of clotted blood at the base of the brain, bleeding there occurring prior to death. The fracture indicated a mortal wound notwithstanding which the deceased might have lived from one to twenty-four hours.

The surgeon who made the autopsy stated that he thought blood "can run down into the stomach after death occurs" but so far as the lungs are concerned the blood would necessarily have to be drawn into them; "it could not run there without being drawn there because of the physiology and anatomy of the throat itself"; that a hemorrhage would not form after death because the blood would have to be pumped in there.

Appellant testified at the coroner's inquest that he tried to pull deceased from the car but that her clothing came loose, burned his hands and that he "passed out" and fell into the fire but revived in time to crawl away without being burned himself. He exhibited his hands to the coroner's jury which showed some small spots resembling burns, but neither was the hair on the back of his hands singed, nor were his eyebrows or hair burned.

There is much other evidence of articles found at or near the wrecked car tending to identify deceased as Mary McClurg, not deemed necessary to comment on here. The trousers worn by appellant on the night of December 9, 1929, were mended by the mother of the wife of appellant's brother with pieces cut from his vest of the same material. Buttons apparently torn from this vest were found very close together near the place where the burned car stood. Appellant urges this was a "plant" since the buttons were not discovered until several days after the tragedy. This

contention is not tenable because the vest was shown to have been delivered to the lady who repaired the trousers, in the same condition, without any buttons on it, by appellant's brother and was never in the possession of the prosecution until the trial when it was introduced in evidence by appellant.

In addition to the evidence heretofore discussed tending to show motive, the record discloses that, on November 30, 1929, appellant and Mary McClurg made separate application at Emmett, to the Equitable Life Assurance Society of the United States, for insurance upon their lives in the sum of $10,000, with double indemnity in case of death by accident. In case of death the policy applied for by deceased was payable to appellant, who made several inquiries of the insurance agent as to when the insurance policies would be in force. While it is probable that the policy on deceased's life was not issued, nor in force at any time, there is evidence tending to show that appellant himself believed it to be in force before Mary McClurg died. In making application for insurance both appellant and deceased falsely stated that the latter was not pregnant, although the autopsy disclosed she had been pregnant for nearly two months prior to her death.

By affidavit, in support of appellant's motion for a new trial, it is alleged that the prosecuting attorney, in his opening statement to the jury, contended that the theory of the prosecution was that the motive for the crime was the collection of life insurance on Mary McClurg's life in favor of appellant and that in closing for the prosecution, the special prosecutor contended that the real motive for the crime was that appellant feared he might be charged with bigamy and so wanted to be rid of deceased. There is ample evidence upon which to argue either or both theories and the action complained of was not improper. Again, the objection sought to be raised is not ground for a new trial under C. S., sec. 9017, and there is no record, other than affidavits on motion for a new trial, of what transpired on the argument of the case before the jury. There is no record of any objection being made thereto by

appellant. Where timely objection is not made, a defendant will be deemed to have waived any objection to the argument by the state's attorney to the jury. (*State v. Wilson,* 32 Wyo. 37, 228 Pac. 803; *Klink v. People,* 16 Colo. 467, 27 Pac. 1062; *Arnold v. Commonwealth,* 194 Ky. 421, 240 S. W. 87.)

After carefully reviewing all the evidence we are satisfied that it is sufficient to sustain the verdict of murder in the first degree and that appellant has been accorded a fair trial. The court did not err in denying the motion for a new trial.

The judgment and order appealed from are affirmed, there being no substantial error disclosed by the record.

Budge, Givens and McNaughton, JJ., and Babcock, D. J., concur.

Petition for rehearing denied.